(99)

JS 44 (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

Sharman Networks Limited, a Vanuatu Corporation

## DEFENDANTS

Claria Corporation, a Delaware Corporation

**(b)** County of Residence of First Listed Plaintiff  Vanuatu and Australia
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   San Mateo, CA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Jeffrey F. Gersh, Esq. SBN. 87124
James A. Sedivy, Esq., 102870
The Gersh Law Firm, Inc.
15821 Ventura Boulevard, Suite 515, Encino, CA 91436

Attorneys (If Known)

Unknown

08-3527 BZ

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| ☐ 1 U.S. Government Plaintiff | ☐ 3 Federal Question (U.S. Government Not a Party) |
| ☐ 2 U.S. Government Defendant | ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☒ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury — | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | | | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | **LABOR** | **SOCIAL SECURITY** | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | Act | ☐ 862 Black Lung (923) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt. Reporting | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 740 Railway Labor Act | | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | ☐ 791 Empl. Ret. Inc. | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | Security Act | or Defendant) | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party | ☐ 900 Appeal of Fee |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | **IMMIGRATION** | 26 USC 7609 | Determination |
| | Employment | ☐ 550 Civil Rights | ☐ 462 Naturalization Application | | Under Equal Access |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | ☐ 463 Habeas Corpus – | | to Justice |
| | Other | | Alien Detainee | | ☐ 950 Constitutionality of |
| | ☐ 440 Other Civil Rights | | ☐ 465 Other Immigration | | State Statutes |
| | | | Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
Diversity - 28 USC  1332
Brief description of cause:
Recognition of Foreign Country Money Judgment

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND £1,483,548 and US $2,985,478 AU $13,071

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

☒ SAN FRANCISCO/OAKLAND    ☐ SAN JOSE

DATE
July 2008

SIGNATURE OF ATTORNEY OF RECORD



1  Jeffrey F. Gersh, State Bar No. 87124
2  James A. Sedivy, State Bar No. 102870
   THE GERSH LAW FIRM, INC.
3  15821 Ventura Boulevard, Suite 515
   Encino, California 91436
4  Telephone: (818) 536-5700
   Facsimile:  (818) 981-4618
5  E-mail: jgersh@gershlegal.com

6  Attorneys for Plaintiff
   SHARMAN NETWORKS LIMITED,
7  a Vanuatu corporation

8              UNITED STATES DISTRICT COURT

9     NORTHERN DISTRICT OF CALIFORNIA - SAN FRANCISCO DIVISION

10

11 SHARMAN NETWORKS LIMITED, a     Case No.
   Vanuatu corporation,                    08      3527
12
                Plaintiff,            COMPLAINT FOR RECOGNITION
13                                    OF FOREIGN-COUNTRY MONEY
        vs.                          JUDGMENT
14
   CLARIA CORPORATION, a Delaware
15 corporation, now know as
   JELLYCLOUD, INC., a Delaware
16 corporation
17
                Defendant.
18

19

20

21      Plaintiff SHARMAN NETWORKS LIMITED ("SHARMAN") complains against

22 Defendant CLARIA CORPORATION ("CLARIA"), now known as JELLYCLOUD,

23 INC., and alleges:

24                      IDENTITY OF PARTIES

25      1.    At all times mentioned herein Plaintiff SHARMAN, was and now is a

26 corporation incorporated under the laws of Vanuatu, with its principal place of business

27 in Vanuatu.

28 //

---
                                    1
       COMPLAINT FOR RECOGNITION OF FOREIGN-COUNTRY MONEY JUDGMENT

THE GERSH LAW FIRM, INC.

1    2.    At all times mentioned herein Defendant CLARIA, was and now is a

2  Delaware corporation, qualified to transact intrastate commerce in the State of California,

3  with its principal place of business located in Redwood City, San Mateo County,

4  California.

5    3.    SHARMAN is informed and believes that CLARIA changed its name to

6  Jellycloud, Inc., on or about April 14, 2008, by filing a Restated Certificate of

7  Incorporation with the State of Delaware Secretary of State, a true and correct copy of

8  which is attached hereto as "Exhibit 1," and incorporated herein by this reference.

9                        JURISDICTION AND VENUE

10    4.    This Court has diversity jurisdiction of this action under 28 U.S.C.

11  §1332.

12    5.    The amount in controversy exceeds $75,000, exclusive of interest and

13  costs.

14    6.    Venue is proper in this Court in that all of the Defendants are subject to

15  personal jurisdiction in this district at the time the action is commenced, and there is

16  no district in which the action may otherwise be brought.

17                        INTRADISTRICT ASSIGNMENT

18    7.    Assignment of this action to the San Francisco Division is proper as the

19  sole defendant, CLARIA, maintains its principal place of business in Redwood City,

20  San Mateo County, California

21                        FACTUAL ALLEGATIONS

22    8.    On September 9, 2003, the Plaintiff SHARMAN entered into a

23  Distribution Agreement with Gain Publishing Limited ("GAIN") a wholly owned

24  subsidiary of CLARIA. Also on  September 9, 2003, CLARIA entered into a

25  guarantee ("Guaranty") in favor of SHARMAN pursuant to which the CLARIA

26  guaranteed the obligations of its subsidiary GAIN under the Distribution Agreement.

27  //

28

THE GERSH LAW FIRM, INC.

2
**COMPLAINT FOR RECOGNITION OF FOREIGN-COUNTRY MONEY JUDGMENT**

9.    Following several breaches of the Distribution Agreement by GAIN, SHARMAN commenced arbitration proceedings on August 12, 2005 against GAIN in London, England. Following a seven day evidential hearing in October 2006, in which Claria was represented by counsel and fully participated in the arbitration, the Tribunal issued a Partial Final Award on January 4, 2007, in which it declared SHARMAN to be the prevailing party and entitled to its reasonable attorneys' fees pursuant to the Distribution Agreement. The Tribunal subsequently issued a Costs Order ordering GAIN to pay SHARMAN's reasonable attorney's fees as determined by the Tribunal. GAIN refused to comply with the Costs Order, following which the Tribunal issued an Interim Award on Costs (the "Costs Award") requiring GAIN to pay sums in the amount of £1,269,682.24 and AUS$12,445.60. awarded to SHARMAN. GAIN refused to satisfy the Costs Award.

10.    Plaintiff SHARMAN issued a notice of demand upon CLARIA on February 8, 2008, for performance of the Costs Award as a Guaranteed Obligation under the Guaranty. CLARIA refused to satisfy the Costs Award. On or about February 22, 2008, SHARMAN commenced an action in the United Kingdom against Defendant CLARIA by filing a claim, issued Claim Number 2008-Folio 214 (the "Claim"), in the High Court of Justice, Queen's Bench Division, Commercial Court, Royal Courts of Justice, London, England (the "English Court") for payment of the sums awarded by the Tribunal in its Costs Award including interest, pursuant to the Guaranty, alternatively for damages in the same sums, and further interest to SHARMAN for obligations owed by GAIN.

11.    The Guaranty provided that any litigation under the Guaranty will be in England and the parties consented to the exclusive personal jurisdiction and venue therein. The Guaranty also provided that in any proceeding related to or arising out of the Guaranty, the losing party shall pay the costs and expenses, including reasonable attorneys' fees, of the prevailing party. A true and correct copy of the

THE GERSH LAW FIRM, INC.

---

3

**COMPLAINT FOR RECOGNITION OF FOREIGN-COUNTRY MONEY JUDGMENT**

1    Claim is attached hereto as "Exhibit 2," and incorporated herein by this reference.

2    12.    On or about March 6, 2008, CLARIA was personally served with the
3    Claim in Redwood City, California. Thereafter, on or about April 29, 2008, CLARIA
4    appeared in the action, represented by counsel, and litigation was duly conducted
5    thereafter. On or about April 29, 2008, SHARMAN filed with the English Court and
6    served CLARIA's counsel with, an Application for Summary Judgment. Thereafter,
7    CLARIA, through its counsel, presented to the English Court its opposition to the
8    application for summary judgment. On or about June 19, 2008, the English Court
9    ruled on SHARMAN's Application of Summary Judgment and ordered that judgment
10   be entered in favor of SHARMAN against CLARIA in the sums: £1,333,548.52 and
11   AUS $13,071.88; and that CLARIA was ordered to pay SHARMAN's costs of the
12   action (including the application for summary judgment), and SHARMAN's costs
13   were to be subject to a detailed assessment if not agreed. CLARIA was ordered to pay
14   SHARMAN the sum of £150,000 on account of costs. A true and correct copy of the
15   judgment duly certified and authenticated is attached hereto as "Exhibit 3," and
16   incorporated herein by this reference. [Using currency conversion rates existing as of
17   July 17, 2008, where £1 =US$2.00379 and AUS$1 =US$.975000, the total judgment
18   entered by the English Court is US$ 2,985,478].

19   13.    The judgment is final, remains unpaid, and is due and owing
20   SHARMAN.

21       WHEREFORE, SHARMAN prays:

22   1.    That the judgment of the English Court be recognized as a valid
23   judgment for SHARMAN and be entered as a California judgment against CLARIA
24   Corporation, now known as Jellycloud, Inc.;

25   2.    That SHARMAN recover its costs of suit;

26   3.    That SHARMAN recover its attorneys fees, according to proof; and

27   4.    For such other and further relief as the Court deems just and proper.

28   //

COMPLAINT FOR RECOGNITION OF FOREIGN-COUNTRY MONEY JUDGMENT

THE GERSH LAW FIRM, INC.

1

2  Dated: July 22, 2008                          THE GERSH LAW FIRM, INC.

3

4                                                Jeffrey F. Gersh, Esq.
5                                                James A. Sedivy, Esq.
                                                 Attorneys for Plaintiff
6                                                SHARMAN NETWORKS LIMITED,
                                                 a Vanuatu corporation
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THE GERSH LAW FIRM, INC.

5

**COMPLAINT FOR RECOGNITION OF FOREIGN-COUNTRY MONEY JUDGMENT**

# Delaware

**PAGE 1**

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT COPIES OF ALL DOCUMENTS FILED FROM AND INCLUDING THE RESTATED CERTIFICATE OR A MERGER WITH A RESTATED CERTIFICATE ATTACHED OF "JELLYCLOUD, INC." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

RESTATED CERTIFICATE, CHANGING ITS NAME FROM "CLARIA CORPORATION" TO "JELLYCLOUD, INC.", FILED THE FOURTEENTH DAY OF APRIL, A.D. 2008, AT 6:30 O'CLOCK P.M.

2922634    8100X

080739569

You may verify this certificate online
at corp.delaware.gov/authver.shtml

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State
AUTHENTICATION: 6695406

DATE: 06-27-08

**EXHIBIT** 1

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 06:30 PM 04/14/2008*
*FILED 06:30 PM 04/14/2008*
*SRV 080426790 - 2922634 FILE*

# RESTATED
## CERTIFICATE OF INCORPORATION

### OF

### CLARIA CORPORATION

The undersigned, Scott VanDeVelde, hereby certifies that:

1.    He is the duly elected and acting President and Chief Executive Officer of Claria Corporation, a Delaware corporation.

2.    The Certificate of Incorporation of this corporation was originally filed with the Secretary of State of Delaware under the name "eGuard, Inc." on July 17, 1998, and amended and restated and filed with the Delaware Secretary of State on March 23, 1999, and amended and restated and filed with the Secretary of State of Delaware on April 22, 1999, and amended and filed with the Secretary of State of Delaware on April 28, 1999 under the name "Gator.com Corporation", and amended and restated and filed with the Secretary of State of Delaware on November 30, 1999, and amended and restated and filed with the Secretary of State of Delaware on February 22, 2000, and amended and restated and filed with the Secretary of State of Delaware on March 28, 2000, and amended and filed with the Secretary of State of Delaware on June 26, 2001 under the name "The Gator Corporation", and amended and filed with the Secretary of State of Delaware under the name "Claria Corporation" on October 22, 2003.

3.    The Certificate of Incorporation of this corporation shall be amended and restated to read in full as follows:

### ARTICLE I

The name of this corporation is JellyCloud, Inc. (the "Corporation").

### ARTICLE II

The address of the Corporation's registered office in the State of Delaware is 2711 Centreville Road, Suite, 400, in the City of Wilmington, County of New Castle. The name of its registered agent at such address is Corporation Service Company.

### ARTICLE III

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the Delaware General Corporation Law.

### ARTICLE IV

(A)    **Classes of Stock.** The Corporation is authorized to issue two classes of stock to be designated, respectively, "Common Stock" and "Preferred Stock." The total number of shares which the Corporation is authorized to issue is Two Hundred Nine Million Four

GDSVF&H\873824.7

7

Hundred Ninety Three Thousand Forty Eight (209,493,048) shares, each with a par value of $0.0001 per share. One Hundred Twenty Three Million Four Hundred Eighty Seven Thousand Five Hundred Ninety Seven (123,487,597) shares shall be Common Stock and Eighty Six Million Five Thousand Four Hundred Fifty One (86,005,451)) shares shall be Preferred Stock.

       (B)    **Rights, Preferences and Restrictions of Preferred Stock.** The Preferred Stock authorized by this Certificate of Incorporation may be issued from time to time in one or more series. The first series of Preferred Stock shall be designated "Series A Preferred Stock" and shall consist of One Million One Hundred Twenty Five Thousand (1,125,000) shares. The second series of Preferred Stock shall be designated "Series B Preferred Stock" and shall consist of Four Million One Hundred Seventy Six Thousand and One (4,176,001) shares. The third series of Preferred Stock shall be designated "Series C Preferred Stock" and shall consist of Eight Million Three Hundred Ninety Six Thousand Eighty Two (8,396,082) shares. The fourth series of Preferred Stock shall be designated "Series D Preferred Stock" and shall consist of Five Million Eight Hundred and Eleven Thousand Nine Hundred and Four (5,811,904) shares. The fifth series of Preferred Stock shall be designated "Series E Preferred Stock" and shall consist of Four Million Seven Hundred Forty Six Thousand Four Hundred and Sixty Four (4,746,464) shares. The sixth series of Preferred Stock shall be designated "Series A-1 Preferred Stock" and shall consist of Sixty One Million Seven Hundred Fifty Thousand (61,750,000) shares. The rights, preferences, privileges, and restrictions granted to and imposed on the Series A Preferred Stock, the Series B Preferred Stock, the Series C Preferred Stock, the Series D Preferred Stock, the Series E Preferred Stock and the Series A-1 Preferred Stock are as set forth below in this Article IV(B).

       1.    **Dividend Provisions.** Subject to the rights of any series of Preferred Stock which may from time to time come into existence, the holders of shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock shall be entitled pari passu to receive dividends, out of any assets legally available therefor, prior and in preference to any declaration or payment of any dividend (payable other than in Common Stock or other securities and rights convertible into or entitling the holder thereof to receive, directly or indirectly, additional shares of Common Stock of the Corporation) on the Common Stock of the Corporation, at the rate of $0.016 per share per annum on each outstanding share of Series A Preferred Stock, $0.048 per share per annum on each outstanding share of Series B Preferred Stock, $0.124 per share per annum on each outstanding share of Series C Preferred Stock, $0.64 per share per annum on each outstanding share of Series D Preferred Stock, $0.68 per share per annum on each outstanding share of Series E Preferred Stock and $0.01944 per share per annum on each outstanding share of Series A-1 Preferred Stock, payable when, as and if declared by the Board of Directors. Such dividends shall not be cumulative.

       2.    **Liquidation.**

       (a)    **Preference.**

       (i)    In the event of any liquidation, dissolution or winding up of the Corporation, either voluntary or involuntary ("Deemed Liquidation"), and subject to the rights of any series of Preferred Stock that may from time to time come

into existence, the holders of Series A-1 Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any of the assets of this Corporation to the holders of Common Stock or Series E Preferred Stock, Series D Preferred Stock, Series C Preferred Stock, Series B Preferred Stock, Series A Preferred Stock, by reason of their ownership thereof, an amount per share equal to the sum of (A) $0.243 per share for each share of Series A-1 Preferred Stock (the "Original Series A-1 Issue Price"), plus (B) any declared but unpaid dividends. If, upon the occurrence of such event, the assets and funds thus distributed among the holders of Series A-1 Preferred Stock shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then the entire assets and funds of the Corporation legally available for distribution shall be distributed ratably among the holders of Series A-1 Preferred Stock in proportion to the preferential amount each such holder is otherwise entitled to receive under this subsection (a)(i).

(ii)     Upon the completion of the distribution required by Section 2(a) above and any other distribution that may be required with respect to any series of Preferred Stock that may from time to time come into existence, the remaining assets of the Corporation available for distribution to stockholders shall be distributed as set forth in subsections (A), (B) and (C) as follows on a *pari passu* basis:

(A)     the holders of Series A-1 Preferred Stock shall be entitled to receive an amount per share equal to the quotient obtained by dividing the Series A-1 Allocation Amount (as defined below) by the number of shares of Series A-1 Preferred Stock then outstanding. For purposes of this Restated Certificate of Incorporation, the "Series A-1 Allocation Amount" shall equal the product obtained by multiplying the amount of such distribution by the percentage obtained by dividing (x) the number of shares of Common Stock issuable upon conversion of all shares of Series A-1 Preferred Stock, by (y) the number of shares of Common Stock of the Corporation then outstanding, including all shares of Common Stock issuable upon exercise, conversion or exchange of Options or Convertible Securities then outstanding (excluding, for the avoidance of doubt, any shares of Common Stock reserved for issuance pursuant to the Corporation's stock option plans) (the "Fully Diluted Shares"). For purposes of this Restated Certificate of Incorporation, "Option" shall mean rights, options or warrants to subscribe for, purchase or otherwise acquire Common Stock or Convertible Securities; and "Convertible Securities" shall mean any evidence of indebtedness, shares or other securities directly or indirectly convertible into, or exercisable or exchangeable for, Common Stock;

(B)     if the Deemed Liquidation is a Change of Control (as defined below), a Management Retention Plan as adopted by the Board of Directors prior to the date of this Restated Certificate of Incorporation, and as amended from time to time with the approval of participants in the Management Retention Plan as set forth therein (the "Management Retention Plan") (and for so long as such Management Retention Plan shall remain in effect) shall be allocated a percentage of such distribution (for further distribution to the participants in the Management Retention Plan pursuant to the terms and conditions of the Management Retention Plan) equal to the percentage obtained by dividing (x) the number of shares of Common Stock (including

*9*

shares of Common Stock issuable upon exercise of outstanding options to purchase Common Stock) held by all the participants in the Management Retention Plan immediately prior to the consummation of the Deemed Liquidation, by (y) the number of Fully Diluted Shares. The Management Retention Plan shall only be distributed assets of the Corporation if distributions are made to any holders of any Prior Preferred Stock, and only until such time as such holders of such Prior Preferred Stock shall have received their applicable Prior Preferred Cap, and after such time distributions to the Management Retention Plan shall cease; and

(C) the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock and Series E Preferred Stock (collectively, the "Prior Preferred Stock") shall be entitled to receive, prior and in preference to any distribution of any of the assets of the Corporation to the holders of Common Stock by reason of their ownership thereof, the remaining percentage of such remaining assets of the Corporation until each such holder has received, pursuant to this subsection (C), an amount per share equal to (i) $0.20 per share for each share of Series A Preferred Stock then held by them; (ii) $0.60 per share for each share of Series B Preferred Stock then held by them, (iii) $1.55 per share for each share of Series C Preferred Stock then held by them, (iv) $8.00 per share for each share of Series D Preferred Stock then held by them, and (v) $8.48 per share for each share of Series E Preferred Stock then held by them, plus any declared but unpaid dividends (subsections (i) through (v), the "Prior Preferred Cap"); and at such time all further distributions pursuant to subsections (A) and (B) above also shall cease. If the assets and funds thus distributed among the holders of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock and Series E Preferred Stock pursuant to this subsection (C) shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then, subject to the rights of any series of Preferred Stock that may from time to time come into existence, the entire assets and funds of the Corporation legally available for distribution and to be distributed pursuant to this subsection (C) shall be distributed ratably among the holders of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock and Series E Preferred Stock in proportion to the preferential amount each such holder is otherwise entitled to receive.

(b) **Remaining Assets.** Upon the completion of the distribution required by Sections 2(a)(i) and (ii) above and any other distribution that may be required with respect to any series of Preferred Stock that may from time to time come into existence, the remaining assets of the Corporation available for distribution to stockholders shall be distributed among the holders of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock, Series A-1 Preferred Stock and the Common Stock pro rata based on the number of shares of Common Stock held by each (assuming conversion of all such Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock) until (i) with respect to the holders of Series A Preferred Stock, such holders shall have received an aggregate of $0.30 per share of Series A Preferred Stock (including amounts paid pursuant to Section 2(a)(ii)(C) above), (ii) with respect to the holders of Series B Preferred Stock, such holders shall have received an aggregate of $0.90 per share of

Series B Preferred Stock (including amounts paid pursuant to Section 2(a)(ii)(C) above), (iii) with respect to the holders of Series C Preferred Stock, such holders shall have received an aggregate of $2,325 per share of Series C Preferred Stock (including amounts paid pursuant to Section 2(a)(ii)(C) above), (iv) with respect to the holders of Series D Preferred Stock, such holders shall have received an aggregate of $12.00 per share of Series D Preferred Stock (including amounts paid pursuant to Section 2(a)(ii)(C) above); and (v) with respect to the holders of Series E Preferred Stock, such holders shall have received an aggregate of $12.72 per share of Series E Preferred Stock (including amounts paid pursuant to Section 2(a)(ii)(C) above); thereafter, subject to the rights of any series of Preferred Stock that may from time to time come into existence, if assets remain in the Corporation, the holders of the Common Stock and Series A-1 Preferred Stock of the Corporation shall receive all of the remaining assets of the Corporation pro rata based on the number of shares of Common Stock held by each (assuming conversion of all such Series A-1 Preferred Stock). All dollar amounts referenced in Sections 2(a) and 2(b) shall be subject to adjustment for any stock splits, stock dividends, combinations, subdivisions, recapitalizations or the like with respect to such series of Preferred Stock.

(c)    **Certain Acquisitions.**

(i)    **Deemed Liquidation.** For purposes of this Section 2, a liquidation, dissolution or winding up of the Corporation shall be deemed to occur if the Corporation shall sell, lease, transfer, convey, or otherwise dispose of or encumber all or substantially all of its property or business or merge into or consolidate with any other Corporation (other than a wholly-owned subsidiary corporation) or effect any other transaction or series of related transactions in which more than fifty percent (50%) of the voting power of the Corporation is disposed of (a "Change of Control"), provided that this Section 2(c)(i) shall not apply to (x) a merger effected exclusively for the purpose of changing the domicile of the Corporation, (y) a merger or consolidation in which the holders of capital stock of the Corporation immediately prior to such merger or consolidation continue to hold at least 50% of the voting power of the capital stock of the Corporation or the surviving or acquiring entity, or (z) a bona fide equity financing, including without limitation the sale of Series A-1 Preferred Stock.

(A)    The Corporation shall not have the power to effect a Deemed Liquidation referred to in this Section 2(c)(i) unless the agreement or plan of merger or consolidation for such transaction provides that the consideration payable to the stockholders of the Corporation shall be allocated among the holders of capital stock of the Corporation in accordance with Sections 2(a) and 2(b) above.

(B)    The amount deemed paid or distributed to the holders of capital stock in accordance with Section 2 shall be the cash or the value of the property, rights or securities paid or distributed to such holders by the Corporation or the acquiring person, firm or other entity.

(ii)    **Valuation of Consideration.** In the event of a deemed liquidation as described in Section 2(c)(i) above, if the consideration received by the Corporation or its stockholders is other than cash, its value will be deemed its fair market value. Any securities shall be valued as follows:

//

(A)    Securities not subject to an investment letter or other similar restrictions on free marketability:

(1)    If traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such exchange over the thirty-day period ending three (3) days prior to the closing;

(2)    If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the thirty-day period ending three (3) days prior to the closing; and

(3)    If there is no active public market, the value shall be the fair market value thereof, as mutually determined by the Corporation and the holders of at least a majority of the voting power of all then outstanding shares of Preferred Stock.

(B)    The method of valuation of securities subject to an investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in Section 2(c)(ii)(A) to reflect the approximate fair market value thereof, as mutually determined by the Corporation and the holders of at least a majority of the voting power of all then outstanding shares of Preferred Stock.

(iii)    **Notice of Transaction.** The Corporation shall give each holder of record of Preferred Stock written notice of such impending transaction not later than ten (10) days prior to the stockholders' meeting called to approve such transaction, or ten (10) days prior to the closing of such transaction, whichever is earlier, and shall also notify such holders in writing of the final approval of such transaction. The first of such notices shall describe the material terms and conditions of the impending transaction and the provisions of this Section 2, and the Corporation shall thereafter give such holders prompt notice of any material changes. The transaction shall in no event take place sooner than ten (10) days after the Corporation has given the first notice provided for herein or sooner than ten (10) days after the Corporation has given notice of any material changes provided for herein; provided, however, that such periods may be shortened upon the written consent of the holders of Preferred Stock that are entitled to such notice rights or similar notice rights and that represent at least a majority of the voting power of all then outstanding shares of such Preferred Stock.

(iv)    **Effect of Noncompliance.** In the event the requirements of this Section 2(c) are not complied with, the Corporation shall forthwith either cause the closing of the transaction to be postponed until such requirements have been complied with, or cancel such transaction, in which event the rights, preferences and privileges of the holders of Preferred Stock shall revert to and be the same as such rights, preferences and privileges existing immediately prior to the date of the first notice referred to in Section 2(c)(iii) hereof.

12

3.   **Redemption.** The Preferred Stock is not redeemable.

4.   **Conversion.** The holders of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock shall have conversion rights as follows (the "Conversion Rights"):

(a)   **Right to Convert.** Subject to Section 4(c), each share of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock shall be convertible, at the option of the holder thereof, at any time after the date of issuance of such share, at the office of the Corporation or any transfer agent for such stock, into such number of fully paid and nonassessable shares of Common Stock as is determined by dividing: (i) $0.20 by the Conversion Price applicable to such share for Series A Preferred Stock, (ii) $0.60 by the Conversion Price applicable to such share for Series B Preferred Stock, (iii) $1.55 by the Conversion Price applicable to such share for Series C Preferred Stock, (iv) $8.00 by the Conversion Price applicable to such share for Series D Preferred Stock, (v) $8.48 by the Conversion Price applicable to such share for Series E Preferred Stock, and (vi) $0.243 by the Conversion Price applicable to such share for Series A-1 Preferred Stock, determined as hereafter provided, in effect on the date the certificate is surrendered for conversion. The initial Conversion Price per share of Series A Preferred Stock shall be $0.20, Series B Preferred Stock shall be $0.60, Series C Preferred Stock shall be $1.55, Series D Preferred Stock shall be $8.00, Series E Preferred Stock shall be $8.48, and Series A-1 Preferred Stock shall be $0.243. Such initial Conversion Prices shall be subject to adjustment as set forth in Section 4(d).

(b)   **Automatic Conversion.**

(i)   **Series A-C Conversion.** Each share of Series A Preferred Stock, Series B Preferred Stock, and Series C Preferred Stock shall automatically be converted into shares of Common Stock at the Conversion Price at the time in effect for such share immediately upon the earlier of (A) except as provided below in Section 4(c), the Corporation's sale of its Common Stock in a firm commitment underwritten public offering pursuant to a registration statement under the Securities Act of 1933, as amended (the "Securities Act"), the public offering price of which is not less than $11.50 per share (appropriately adjusted for any stock split, dividend, combination or other recapitalization) and which results in aggregate cash proceeds (net of underwriting discounts and commissions) of $50,000,000 or (B) the date specified by written consent or agreement of the holders of at least a majority of the then-outstanding shares of Series A Preferred Stock, Series B Preferred Stock and Series C Preferred Stock, voting together as a single class.

(ii)   **Series D Conversion.** Each share of Series D Preferred Stock shall automatically be converted into shares of Common Stock at the Conversion Price at the time in effect for such share immediately upon the earlier of (A) except as provided below in Section 4(c), the Corporation's sale of its Common Stock in a firm commitment underwritten public offering pursuant to a registration statement under the Securities Act, the public offering price of which is not less than $11.50 per

13

share (appropriately adjusted for any stock split, dividend, combination or other recapitalization) and which results in aggregate cash proceeds (net of underwriting discounts and commissions) of $50,000,000 or (B) the date specified by written consent or agreement of the holders of at least a majority of the then-outstanding shares of Series D Preferred Stock, voting separately as a class.

(iii)    **Series E Conversion.** Each share of Series E Preferred Stock shall automatically be converted into shares of Common Stock at the Conversion Price at the time in effect for such share immediately upon the earlier of (A) except as provided below in Section 4(c), the Corporation's sale of its Common Stock in a firm commitment underwritten public offering pursuant to a registration statement under the Securities Act, the public offering price of which is not less than $11.50 per share (appropriately adjusted for any stock split, dividend, combination or other recapitalization) and which results in aggregate cash proceeds (net of underwriting discounts and commissions) of $50,000,000 or (B) the date specified by written consent or agreement of the holders of at least a majority of the then-outstanding shares of Series E Preferred Stock, voting separately as a class.

(iv)    **Series A-1 Conversion.**

(A)    Each share of Series A-1 Preferred Stock shall automatically be converted into shares of Common Stock at the Conversion Price at the time in effect for such share immediately upon the earlier of (1) except as provided below in Section 4(c), the Corporation's sale of its Common Stock in a firm commitment underwritten public offering pursuant to a registration statement under the Securities Act, the public offering price of which is not less than $11.50 per share (appropriately adjusted for any stock split, dividend, combination or other recapitalization) and which results in aggregate cash proceeds (net of underwriting discounts and commissions) of $50,000,000 or (2) the date specified by written consent or agreement of the holders of at least a majority of the then-outstanding shares of Series A-1 Preferred Stock, voting separately as a class.

(B)    If any holder of Series A-1 Preferred Stock has defaulted on such holder's commitment to purchase shares of Series A-1 Preferred Stock pursuant to that certain Series A-1 Preferred Stock Purchase Agreement, dated on or about the date of this Restated Certificate of Incorporation, between the Corporation and certain stockholders named therein (the "Series A-1 Preferred Stock Purchase Agreement"), then on the date that is 5 days after such default, if such default has not been cured in full, each share of Series A-1 Preferred Stock held by such stockholder shall automatically be converted into one (1) share of Common Stock (appropriately adjusted for any stock split, dividend, combination or other recapitalization).

(c)    **Mechanics of Conversion.** Before any holder of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock or Series A-1 Preferred Stock shall be entitled to convert the same into shares of Common Stock, it shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Corporation or of any transfer agent for such series of Preferred Stock, and

*14*

shall give written notice to the Corporation at its principal corporate office, of the election to convert the same and shall state therein the name or names in which the certificate or certificates for shares of Common Stock are to be issued. The Corporation shall, as soon as practicable thereafter, issue and deliver at such office to such holder of Preferred Stock, or to the nominee or nominees of such holder, a certificate or certificates for the number of shares of Common Stock to which such holder shall be entitled as aforesaid. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the shares of such series of Preferred Stock to be converted, and the person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock as of such date. If the conversion is in connection with an underwritten offering of securities registered pursuant to the Securities Act the conversion may, at the option of any holder tendering such Preferred Stock for conversion, be conditioned upon the closing with the underwriters of the sale of securities pursuant to such offering, in which event the person(s) entitled to receive Common Stock upon conversion of such Preferred Stock shall not be deemed to have converted such Preferred Stock until immediately prior to the closing of such sale of securities. If the conversion is in connection with Automatic Conversion provisions of subsections 4(b)(i)(B), 4(b)(ii)(B), 4(b)(iii)(B) and 4(b)(iv)(A)(2) above, such conversion shall be deemed to have been made on the conversion date described in the stockholder consent approving such conversion, and the persons entitled to receive shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holders of such shares of Common Stock as of such date. If the conversion is in connection with Automatic Conversion provisions of subsection 4(b)(iv)(B), such holder of Preferred Stock shall surrender the certificates representing such shares at the office of the Corporation or any transfer agent for the Preferred Stock or Common Stock; provided, however, that the Corporation shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such conversion unless the certificates evidencing such shares of Preferred Stock are either delivered to the Corporation or its transfer agent as provided below, or the holder notifies the Corporation or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Corporation to indemnify the Corporation from any loss incurred by it in connection with such certificates. Thereupon, there shall be issued and delivered to such holder promptly at such office and in its name as shown on such surrendered certificate or certificates, a certificate or certificates for the number of shares of Common Stock into which the shares of Preferred Stock surrendered were convertible on the date on which such conversion occurred.

(d)     **Conversion Price Adjustments of Preferred Stock for Certain Dilutive Issuances, Splits and Combinations.** The Conversion Price of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock, respectively, shall be subject to adjustment from time to time as follows:

(i)     **Issuance of Additional Stock below Purchase Price** . If the Corporation shall issue, on or after the date upon which this Restated Certificate of Incorporation is accepted for filing by the Secretary of State of the State of Delaware (the "Filing Date"), any Additional Stock (as defined below) without consideration or for a consideration per share less than the Conversion Price for such series in effect immediately prior to the issuance of such Additional Stock, the

GDSVF&H\873824.7

9

/15/

Conversion Price for such series in effect immediately prior to each such issuance shall automatically be adjusted as set forth in this Section 4(d)(i), unless otherwise provided in this Section 4(d)(i).

(A) **Adjustment Formula.** Whenever the Conversion Price is adjusted pursuant to this Section (4)(d)(i), the new Conversion Price shall be determined by multiplying the Conversion Price then in effect by a fraction, (x) the numerator of which shall be the number of shares of Common Stock outstanding immediately prior to such issuance (the "Outstanding Common") plus the number of shares of Common Stock that the aggregate consideration received by the Corporation for such issuance would purchase at such Conversion Price; and (y) the denominator of which shall be the number of shares of Outstanding Common plus the number of shares of such Additional Stock. For purposes of the foregoing calculation, the term "Outstanding Common" shall include shares of Common Stock deemed issued pursuant to Section 4(d)(i)(E) below.

(B) **Definition of "Additional Stock".** For purposes of this Section 4(d)(i), "Additional Stock" shall mean any shares of Common Stock issued (or deemed to have been issued pursuant to Section 4(d)(i)(E)) by the Corporation after the Filing Date) other than

(1) Shares of Common Stock issued pursuant to a transaction described in Section 4(d)(ii) hereof,

(2) All shares of Common Stock reserved for issuance pursuant to a stock option plan or restricted stock plan approved by two-thirds (2/3) of the members of the Board of Directors of the Corporation then in office,

(3) Capital stock, or options or warrants to purchase capital stock, issued to financial institutions or lessors in connection with commercial credit arrangements, equipment financings or similar transactions,

(4) Shares of Common Stock or Preferred Stock issuable upon exercise of warrants, notes or other purchase rights outstanding as of the date of this Certificate of Incorporation,

(5) Shares of Common Stock or Preferred Stock issuable pursuant to the Series A-1 Preferred Stock Purchase Agreement,

(6) Shares of Common Stock or Preferred Stock issued in connection with bona fide acquisitions, mergers or similar transactions, the terms of which are approved by two-thirds (2/3) of the members of the Board of Directors of the Corporation then in office,

(7) Shares of Common Stock issued or issuable upon conversion of the Series A Preferred Stock, Series B Preferred Stock,

GDSVF&H\873824.7

10

/6

Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock,

(8)    Shares of Common Stock issued or deemed issued pursuant to subsection 4(d)(i)(E) as a result of a decrease in the Conversion Price of any series of Preferred Stock resulting from the operation of Section 4(d), and

(9)    Shares of Common Stock issued or issuable in a public offering prior to or in connection with which all outstanding shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock will be converted to Common Stock.

(C)    **No Fractional Adjustments.** No adjustment of the Conversion Price for the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock or Series A-1 Preferred Stock shall be made in an amount less than one cent per share, provided that any adjustments which are not required to be made by reason of this sentence shall be carried forward and shall be either taken into account in any subsequent adjustment made prior to three years from the date of the event giving rise to the adjustment being carried forward, or shall be made at the end of three years from the date of the event giving rise to the adjustment being carried forward.

(D)    **Determination of Consideration.** In the case of the issuance of Common Stock for cash, the consideration shall be deemed to be the amount of cash paid therefor before deducting any reasonable discounts, commissions or other expenses allowed, paid or incurred by the Corporation for any underwriting or otherwise in connection with the issuance and sale thereof. In the case of the issuance of the Common Stock for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair value thereof as determined by the Board of Directors irrespective of any accounting treatment.

(E)    **Deemed Issuances of Common Stock.** In the case of the issuance (whether before, on or after the Filing Date) of options to purchase or rights to subscribe for Common Stock, securities by their terms convertible into or exchangeable for Common Stock or options to purchase or rights to subscribe for such convertible or exchangeable securities, the following provisions shall apply for purposes of determining the number of shares of Additional Stock issued and the consideration paid therefor:

(1)    The aggregate maximum number of shares of Common Stock deliverable upon exercise (assuming the satisfaction of any conditions to exercisability, including without limitation, the passage of time, but without taking into account potential antidilution adjustments) of such options to purchase or rights to subscribe for Common Stock shall be deemed to have been issued at the time such options or rights were issued and for a consideration equal to the consideration

ODSVF&JN873824.7

11

*17*

(determined in the manner provided in Section 4(d)(i)(D)), if any, received by the Corporation upon the issuance of such options or rights plus the minimum exercise price provided in such options or rights (without taking into account potential antidilution adjustments) for the Common Stock covered thereby.

(2)     The aggregate maximum number of shares of Common Stock deliverable upon conversion of or in exchange (assuming the satisfaction of any conditions to convertibility or exchangeability, including, without limitation, the passage of time, but without taking into account potential antidilution adjustments) for any such convertible or exchangeable securities or upon the exercise of options to purchase or rights to subscribe for such convertible or exchangeable securities and subsequent conversion or exchange thereof shall be deemed to have been issued at the time such securities were issued or such options or rights were issued and for a consideration equal to the consideration, if any, received by the Corporation for any such securities and related options or rights (excluding any cash received on account of accrued interest or accrued dividends), plus the minimum additional consideration, if any, to be received by the Corporation (without taking into account potential antidilution adjustments) upon the conversion or exchange of such securities or the exercise of any related options or rights (the consideration in each case to be determined in the manner provided in Section 4(d)(i)(D)).

(3)     In the event of any change in the number of shares of Common Stock deliverable or in the consideration payable to this Corporation upon exercise of such options or rights or upon conversion of or in exchange for such convertible or exchangeable securities, the Conversion Price of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock or Series A-1 Preferred Stock, to the extent in any way affected by or computed using such options, rights or securities, shall be recomputed to reflect such change, but no further adjustment shall be made for the actual issuance of Common Stock or any payment of such consideration upon the exercise of any such options or rights or the conversion or exchange of such securities.

(4)     Upon the expiration of any such options or rights, the termination of any such rights to convert or exchange or the expiration of any options or rights related to such convertible or exchangeable securities, the Conversion Price of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock, respectively, to the extent in any way affected by or computed using such options, rights or securities or options or rights related to such securities, shall be recomputed to reflect the issuance of only the number of shares of Common Stock (and convertible or exchangeable securities which remain in effect) actually issued upon the exercise of such options or rights, upon the conversion or exchange of such securities or upon the exercise of the options or rights related to such securities.

(5)     The number of shares of Common Stock deemed issued and the consideration deemed paid therefor pursuant to Sections 4(d)(i)(E)(1) and 4(d)(i)(E)(2) shall be appropriately adjusted to reflect any change,

*18*

termination or expiration of the type described in either Section 4(d)(i)(E)(3) or 4(d)(i)(E)(4).

(F) **No Increased Conversion Price.** Notwithstanding any other provisions of this Section (4)(d)(i), except to the limited extent provided for in Sections 4(d)(i)(E)(3) and 4(d)(i)(E)(4), no adjustment of the Conversion Price pursuant to this Section 4(d)(i) shall have the effect of increasing the Conversion Price above the Conversion Price in effect immediately prior to such adjustment.

(ii) **Stock Splits and Dividends.** In the event the Corporation should at any time or from time to time after the Filing Date fix a record date for the effectuation of a split or subdivision of the outstanding shares of Common Stock or the determination of holders of Common Stock entitled to receive a dividend or other distribution payable in additional shares of Common Stock or other securities or rights convertible into, or entitling the holder thereof to receive directly or indirectly, additional shares of Common Stock (hereinafter referred to as "Common Stock Equivalents") without payment of any consideration by such holder for the additional shares of Common Stock or the Common Stock Equivalents (including the additional shares of Common Stock issuable upon conversion or exercise thereof), then, as of such record date (or the date of such dividend distribution, split or subdivision if no record date is fixed), the Conversion Price of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, the Series D Preferred Stock, the Series E Preferred Stock and the Series A-1 Preferred Stock shall be appropriately decreased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be increased in proportion to such increase of the aggregate of shares of Common Stock outstanding and those issuable with respect to such Common Stock Equivalents with the number of shares issuable with respect to Common Stock Equivalents determined from time to time in the manner provided for deemed issuances in Section 4(d)(i)(E).

(iii) **Reverse Stock Splits.** If the number of shares of Common Stock outstanding at any time after the Filing Date is decreased by a combination of the outstanding shares of Common Stock, then, following the record date of such combination, the Conversion Price for the Series A Preferred Stock, the Series B Preferred Stock, the Series C Preferred Stock, the Series D Preferred Stock, the Series E Preferred Stock and the Series A-1 Preferred Stock shall be appropriately increased so that the number of shares of Common Stock issuable on conversion of each share of such series shall be decreased in proportion to such decrease in outstanding shares.

(e) **Other Distributions.** In the event the Corporation shall declare a distribution payable in securities of other persons, evidences of indebtedness issued by the Corporation or other persons, assets (excluding cash dividends) or options or rights not referred to in Section 4(d)(ii), then, in each such case for the purpose of this Section 4(e), the holders of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock shall be entitled to a proportionate share of any such distribution as though they were the holders of the number of shares of Common Stock of the Corporation into which their shares of Preferred Stock are

convertible as of the record date fixed for the determination of the holders of Common Stock of the Corporation entitled to receive such distribution.

(f) **Recapitalizations.** If at any time or from time to time there shall be a recapitalization of the Common Stock (other than a subdivision, combination or merger or sale of assets transaction provided for elsewhere in this Section 4 or Section 2) provision shall be made so that the holders of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock shall thereafter be entitled to receive upon conversion of such Preferred Stock the number of shares of stock or other securities or property of the Corporation or otherwise, to which a holder of Common Stock deliverable upon conversion would have been entitled on such recapitalization. In any such case, appropriate adjustment shall be made in the application of the provisions of this Section 4 with respect to the rights of the holders of such Preferred Stock after the recapitalization to the end that the provisions of this Section 4 (including adjustment of the Conversion Price then in effect and the number of shares purchasable upon conversion of such Preferred Stock) shall be applicable after that event and be as nearly equivalent as practicable.

(g) **No Impairment.** The Corporation will not, without the appropriate vote of the stockholders under the General Corporation Law or Section 6 of this Article IV(B), by amendment of its Certificate of Incorporation or through any reorganization, recapitalization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Corporation, but will at all times in good faith assist in the carrying out of all the provisions of this Section 4 and in the taking of all such action as may be necessary or appropriate in order to protect the Conversion Rights of the holders of Preferred Stock against impairment.

(h) **No Fractional Shares and Certificate as to Adjustments.**

(i) No fractional shares shall be issued upon the conversion of any share or shares of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock or Series A-1 Preferred Stock, and the number of shares of Common Stock to be issued shall be rounded to the nearest whole share. The number of shares issuable upon such conversion shall be determined on the basis of the total number of shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock that the holder is at the time converting into Common Stock and the number of shares of Common Stock issuable upon such aggregate conversion.

(ii) Upon the occurrence of each adjustment or readjustment of the Conversion Price of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock or Series A-1 Preferred Stock pursuant to this Section 4, the Corporation, at its expense, shall promptly compute such adjustment or readjustment in accordance with the terms hereof and prepare and furnish to each holder of such Preferred Stock a certificate setting

forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Corporation shall, upon the written request at any time of any holder of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock, furnish or cause to be furnished to such holder a like certificate setting forth (A) such adjustment and readjustment, (B) the Conversion Price for the Series A Preferred Stock, Series B Preferred Stock, the Series C Preferred Stock, the Series D Preferred Stock, the Series E Preferred Stock and the Series A-1 Preferred Stock, respectively, at the time in effect, and (C) the number of shares of Common Stock and the amount, if any, of other property which at the time would be received upon the conversion of a share of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and the Series A-1 Preferred Stock.

(i) **Notices of Record Date.** Upon (i) any taking by the Corporation of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, (ii) any Deemed Liquidation as defined in Article IV, (B), 2, (c) or any capital reorganization, or (iii) the occurrence of the voluntary or involuntary dissolution, liquidation or winding-up of the Corporation, the Corporation shall mail to each holder of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock at least ten (10) days prior to the date specified therein a notice specifying (A) the date on which any such record is to be taken for the purpose of such dividend, distribution or right and a description of such dividend, distribution or right, (B) the date on which any Deemed Liquidation or other such event as described in this Section 4(i) is expected to become effective and (C) the date, if any, that is to be fixed as to when the holders of record of Common Stock (or other securities) shall be entitled to exchange their shares of Common Stock (or other securities) for securities or other property deliverable upon such Deemed Liquidation.

(j) **Reservation of Stock Issuable Upon Conversion.** The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of such series of Preferred Stock; and if at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of such series of Preferred Stock, in addition to such other remedies as shall be available to the holder of such Preferred Stock, the Corporation will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purposes, including, without limitation, engaging in best efforts to obtain the requisite stockholder approval of any necessary amendment to this Certificate of Incorporation.

(k) **Notices.** Any notice required by the provisions of this Section 4 to be given to the holders of shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock or Series A-1

21

Preferred Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at his address appearing on the books of the Corporation.

5. **Voting Rights.**

(a) **General.** The holder of each share of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock and Series A-1 Preferred Stock shall have the right to one vote for each share of Common Stock into which such Preferred Stock could then be converted, and with respect to such vote, such holder shall have full voting rights and powers equal to the voting rights and powers of the holders of Common Stock, and shall be entitled, notwithstanding any provision hereof, to notice of any stockholders' meeting in accordance with the bylaws of the Corporation, and shall be entitled to vote, together with holders of Common Stock, with respect to any question upon which holders of Common Stock have the right to vote. Fractional votes shall not, however, be permitted and any fractional voting rights available on an as-converted basis (after aggregating all shares into which shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock or Series A-1 Preferred Stock held by each holder could be converted) shall be rounded to the nearest whole number (with one-half being rounded upward).

(b) **Election of Directors.** (i) The holders of record of the shares of Series A Preferred Stock and Series B Preferred Stock, exclusively and voting together as a single class, shall be entitled to elect one (1) director of the Corporation, (ii) the holders of record of the shares of Series C Preferred Stock, exclusively and as a separate class, shall be entitled to elect two (2) directors of the Corporation, (iii) the holders of record of the shares of Series D Preferred Stock, exclusively and as a separate class, shall be entitled to elect one (1) director of the Corporation, (iv) the holders of record of the shares of Series E Preferred Stock, exclusively and as a separate class, shall be entitled to elect one (1) director of the Corporation, (v) the holders of record of the shares of Series A-1 Preferred Stock, exclusively and as a separate class, shall be entitled to elect three (3) directors of the Corporation, (vi) the holders of record of the shares of Common Stock, exclusively and as a separate class, shall be entitled to elect one (1) director of the Corporation, and (vii) the holders of Preferred Stock and Common Stock (voting together as a single class and not as separate series, and on an as-converted basis) shall be entitled to elect any remaining directors of this Corporation. Any director elected as provided in the preceding sentence may be removed without cause by, and only by, the affirmative vote of the holders of the shares of the class or series of capital stock entitled to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders. At any meeting held for the purpose of electing a director, the presence in person or by proxy of the holders of a majority of the outstanding shares of the class or series entitled to elect such director shall constitute a quorum for the purpose of electing such director. A vacancy in any directorship filled by the holders of any class or series shall be filled only by vote or written consent in lieu of a meeting of the holders of such class or series or by any remaining director or directors elected by the holders of such class or series pursuant to this Section 5(b). The rights of the holders of each series of Preferred Stock under the first sentence of this Section 5(b) shall terminate on the first date following the date on which the original investors in such series of Preferred Stock no longer hold a majority of the shares of such series of Preferred Stock (subject to appropriate

22

adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization affecting such shares).

6.   **Protective Previsions.**

(a)   **Series A-1 Vote.** So long as any shares of Series A-1 Preferred Stock are outstanding, the Corporation shall not (by amendment, merger, consolidation or otherwise) without first obtaining the approval (by vote or written consent, as provided by law) of the holders of at least a majority of the then outstanding shares of Series A-1 Preferred Stock:

(i)   effect a transaction described in Section 2(c)(i) above;

(ii)   alter or change the rights, preferences or privileges of the shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock or Series A-1 Preferred Stock so as to affect adversely the shares of such series, respectively;

(iii)   increase or decrease (other than by redemption or conversion) the total number of authorized shares of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock or Series A-1 Preferred Stock;

(iv)   except for shares of Series A-1 Preferred Stock, authorize or issue, or obligate itself to issue, any other equity security, including any other security convertible into or exercisable for any equity security, having a preference over, or being on a parity with, the Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock, Series D Preferred Stock, Series E Preferred Stock or Series A-1 Preferred Stock with respect to voting, dividends, conversion or upon liquidation;

(v)   effect a reclassification or recapitalization of the outstanding capital of the Corporation;

(vi)   amend the certificate of incorporation or bylaws of the Corporation in a manner which adversely affects the rights, preferences or privileges of the shares of the holders of the Preferred Stock;

(vii)   issue principal amount of indebtedness for borrowed money in excess of five million dollars ($5,000,000.00) and excluding (A) equipment, capital lease or other commercial leasing arrangements, or (B) receivables-backed lending arrangements; and

(viii)   declare or pay dividends with respect to any class of capital stock of the Corporation (other than repurchases of shares or options to purchase shares held by departing employees or pursuant to rights of repurchase pursuant to the Corporation's employee stock option plan or otherwise held by the Corporation pursuant

GDSVF&H\873824.7

17

23

to written agreements in effect as of the date this Restated Certificate of Incorporation is filed with the Delaware Secretary of State;

(ix)    change the size of the Corporation's Board of Directors;

(x)    repurchase or redeem any shares of Series A, B, C, D, E or A-1 Preferred Stock; and

(xi)    amend the Certificate of Incorporation or Bylaws of the Corporation in a manner which materially and adversely affects the holders of Series A-1 Preferred Stock.

(b)    **Series D Vote.** So long as any shares of Series D Preferred Stock are outstanding, the Corporation shall not (by amendment, merger, consolidation or otherwise) without first obtaining the approval (by vote or written consent, as provided by law) of the holders of at least a majority of the then outstanding shares of Series D Preferred Stock

(i)    alter or change the rights, preferences or privileges of the shares of Series D Preferred Stock so as to affect adversely the shares of such series in a manner differently than any other series of Preferred Stock;

(ii)    repurchase or redeem any shares of Series A, B or C Preferred Stock; and

(iii)    amend the Certificate of Incorporation or Bylaws of the Corporation in a manner which materially adversely affects the holders of Series D Preferred Stock in a manner differently than the other series of Preferred Stock.

(c)    **Series E Vote.** So long as any shares of Series E Preferred Stock are outstanding, the Corporation shall not (by amendment, merger, consolidation or otherwise) without first obtaining the approval (by vote or written consent, as provided by law) of the holders of at least a majority of the then outstanding shares of Series E Preferred Stock

(i)    alter or change the rights, preferences or privileges of the shares of Series E Preferred Stock so as to affect adversely the shares of such series;

(ii)    repurchase or redeem any shares of Series A, B, C or D Preferred Stock;

(iii)    amend the Certificate of Incorporation or Bylaws of the Corporation in a manner which materially and adversely affects the holders of Series E Preferred Stock; and.

(iv)    so long as at least fifty percent (50%) of the shares of the authorized Series E Preferred Stock remain outstanding, authorize or issue, or obligate itself to issue, any other equity security, including any other security convertible

GDSVF&H\873824.7                                18

24

into or exercisable for any equity security, having a preference over the Series E
Preferred Stock with respect to voting, dividends, conversion or upon liquidation.

       7.    **Status of Converted Stock.** In the event any shares of Preferred
Stock shall be converted pursuant to Section 4 hereof, the shares so converted shall be cancelled
and shall not be issuable by the Corporation. The Certificate of Incorporation of the Corporation
shall be appropriately amended to effect the corresponding reduction in the Corporation's
authorized capital stock.

      (C)    **Common Stock.**

       1.    **Dividend Rights.** Subject to the prior rights of holders of all
classes of stock at the time outstanding having prior rights as to dividends, the holders of the
Common Stock shall be entitled to receive, when and as declared by the Board of Directors, out
of any assets of the Corporation legally available therefor, such dividends as may be declared
from time to time by the Board of Directors.

       2.    **Liquidation Rights.** Upon the liquidation, dissolution or winding
up of the Corporation, the assets of the Corporation shall be distributed as provided in Section 2
of Article IV(B).

       3.    **Redemption.** The Common Stock is not redeemable at the option
of the holder.

       4.    **Voting Rights.** The holder of each share of Common Stock shall
have the right to one vote, and shall be entitled to notice of any stockholders' meeting in
accordance with the bylaws of the Corporation, and shall be entitled to vote upon such matters
and in such manner as may be provided by law. The number of authorized shares of Common
Stock may be increased or decreased (but not below the number of shares thereof then
outstanding) by the affirmative vote of the holders of a majority of the stock of this Corporation
entitled to vote, irrespective of the provisions of Section 242(b)(2) of the General Corporation
Law.

## ARTICLE V

      The Board of Directors of the Corporation is expressly authorized to make, alter or repeal
Bylaws of the Corporation.

## ARTICLE VI

      Elections of directors need not be by written ballot unless otherwise provided in the
Bylaws of the Corporation.

## ARTICLE VII

      (A)    To the fullest extent permitted by the Delaware General Corporation Law,
as the same exists or as may hereafter be amended, a director of the Corporation shall not be

GDSVF&H\873524.7

19

25

personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

(B)    The Corporation shall indemnify to the fullest extent permitted by law any person made or threatened to be made a party to an action or proceeding, whether criminal, civil, administrative or investigative, by reason of the fact that he, his testator or intestate is or was a director or officer of the Corporation or any predecessor of the Corporation, or serves or served at any other enterprise as a director or officer at the request of the Corporation or any predecessor to the Corporation.

(C)    Neither any amendment nor repeal of this Article VII, nor the adoption of any provision of the Corporation's Certificate of Incorporation inconsistent with this Article VII, shall eliminate or reduce the effect of this Article VII in respect of any matter occurring, or any action or proceeding accruing or arising or that, but for this Article VII, would accrue or arise, prior to such amendment, repeal or adoption of an inconsistent provision.

The foregoing Restated Certificate of Incorporation has been duly adopted by this Corporation's Board of Directors and stockholders in accordance with the applicable provisions of Sections 228, 242 and 245 of the General Corporation Law of the State of Delaware.

### [Remainder of page intentionally left blank.]

ODSVF&H873824.7

20

26

Executed this 14th day of April, 2008.

/s/ Scott VanDeVelde
Scott VanDeVelde, President and CEO

GDSVF&H\873824.7          Signature Page to Claris Corporation's Restated Certificate of Incorporation

27

*Issued Pursuant to the Order of Mr. Justice Atkins dated 28th February 2008*



**Claim Form**

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**
**ROYAL COURTS OF JUSTICE**

for court use only

**Claim No.**        2008    Folio  214

**Issue date**      3rd March 2008

| **Claimant** | Sharman Networks Limited |
| of | 1st Floor, BDO House Port Villa, Vanuatu |

- and -

| **Defendant** | Claria Corporation |
| of | 555 Broadway Street, Redwood City California 94063, USA |

Name and Address of Defendant receiving this claim form

Claria Corporation
555 Broadway Street
Redwood City
California 94063
USA

|  |  | £ |
|---|---|---|
| **Amounts claimed** | Unspecified | |
| **Court fee** | £ 1930 | |
| **Solicitor's costs** | £ To be assessed | |
| **Total amount** | £ Unspecified | |

The court office at the Admiralty & Commercial Registry, Royal Courts of Justice, Strand, London WC2A 2LL is open between 10am and 4.30pm (2.30pm during August) Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the case number.

N1(CC) Claim form (CPR Part 7) (March 2002)

**EXHIBIT** 

*28*

| Claim No. | 2008 | Folio |
|-----------|------|-------|

Brief details of claim

1.   The Defendant entered into a guarantee in favour of the Claimant dated 9 September
     2003 (the "Guaranty") pursuant to which it guaranteed the obligations of GAIN
     Publishing Limited ("GAIN") under a distribution agreement dated 9 September 2003
     (the "Distribution Agreement") entered into by GAIN with the Claimant.

2.   The Claimant commenced arbitration proceedings on 12 August 2005 against GAIN for
     breaches of the Distribution Agreement.

3.   Pursuant to clause 13 of the Distribution Agreement the losing party in any proceedings
     related to or arising out of the Distribution Agreement was obliged to pay the costs and
     expenses (including reasonable attorneys' fees) of the prevailing party as determined by
     the arbitration panel.

4.   An arbitral tribunal comprising three arbitrators (Alan Redfern, David Williams QC
     and Samuel Haubold) was properly and duly constituted on 23 November 2005 (the
     "Tribunal") in accordance with the terms of the Distribution Agreement.

5.   Following an evidential hearing in early October 2006 the Tribunal issued its Partial
     Final Award on 4 January 2007 in which it declared that the Claimant was the
     prevailing party and was therefore entitled to its costs pursuant to clause 13 of the
     Distribution Agreement.

6.   On 5 February 2008, the Tribunal issued an Interim Award on Costs (the "Costs
     Award") holding, declaring and awarding that GAIN should forthwith pay to Sharman
     £1,269,682.24 and AUD $12,445.60, which had been assessed and determined by the
     Tribunal as being Sharman's entitlement to costs and expenses (including reasonable
     attorney fees) pursuant to its award of 4 January 2007, together with simple interest at
     the rate of 9% per annum from 28 November 2007 until payment.

7.   GAIN has failed to comply with the Costs Award.

8.   The Claimant has demanded the Defendant to satisfy the Costs Award pursuant to the
     Guaranty but wrongfully and in breach of the Guaranty the Defendant has failed to do
     so.

9.   The Claimant claims against the Defendant pursuant to the Guaranty payment of the
     sums awarded by the Tribunal in its Costs Award including interest at 9% from 28
     November 2007; alternatively damages in the same sums.

29

10.    The Claimant further claims interest pursuant to section 35A of the Supreme Court Act
       1985.

Does, or will your claim include any issues under the Human Rights Act 1998? ~~Yes~~/No

Particulars of claim attached.


**STATEMENT OF TRUTH**
The Claimant believes that the facts stated in this Claim Form are true.

I am duly authorised by the Claimant to sign this statement

Full Name: Nicholas Hugo Martin Fletcher

Name of Claimant's Solicitor's firm:
**CLIFFORD CHANCE LLP**

·Signed: ................................................
Solicitors for the Claimant

Position or Office held: Partner

```
CLIFFORD CHANCE LLP
10 Upper Bank Street
London E14 5JJ
Tel: 020 7006 1000
Fax: 020 7006 5555
DX: 149120 Canary Wharf 3
Ref: NHMF/70-40348748
```

30

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
ROYAL COURTS OF JUSTICE

Claim No 2008 Folio

**B E T W E E N**

**SHARMAN NETWORKS LIMITED**

**Claimant**

- and -

**CLARIA CORPORATION**

(formerly known as Gator Corporation)

**Defendant**

---

## PARTICULARS OF CLAIM

---

*Introduction*

1.  The Claimant (**"Sharman"**) is a company incorporated under the laws of Vanuatu which developed a file-sharing software application called Kazaa Media Desktop (**"Kazaa"**).

2.  The Defendant (**"Claria"**) is a company incorporated in Delaware which developed an advertising software application called GAIN AdServer. Claria was formerly known as Gator Corporation.

3.  GAIN Publishing Limited (**"GAIN"**) is a company incorporated under the laws of the Republic of Ireland and is wholly owned by Claria.

4.  Claria granted GAIN a right to license the GAIN AdServer to Sharman.

UK/1566782/05                           3/                           268803/70-40348748

*The agreements*

5.    By a written agreement dated 9 September 2003 (the **"Distribution Agreement"**)
      Sharman and GAIN agreed that Sharman would distribute GAIN AdServer with Kazaa
      in consideration for a share of advertising revenues as specified more particularly in
      the Distribution Agreement.

6.    The Distribution Agreement had, among others, the following express terms:

          *"13.  Arbitration.  Any controversy or claim arising out of or relating to this
          Agreement, or the breach thereof, shall be determined by binding arbitration
          administered by the International Center for Dispute Resolution of the
          American Arbitration Association in accordance with its International
          Arbitration Rules.  The number of arbitrators shall be three; the place of
          arbitration shall be London, England; the language of the arbitration shall be
          in English; and the losing party in any proceeding related to or arising out of
          this Agreement shall pay the costs and expenses (including reasonable
          attorneys' fees) of the prevailing party as determined by the arbitration
          panel...*

          *14. Parent Guaranty. [Claria] shall provide to Sharman a guaranty, governed
          by the law of New York, and with jurisdiction and venue in, New South Wales,
          Australia, pursuant to which [Claria] shall be responsible for and will guaranty
          the full and punctual performance by [GAIN] of all of its obligations hereunder
          to the same extent as if [Claria] and not [GAIN] were the counterparty to this
          Agreement."*

7.    On 9 September 2003, Claria executed a written guarantee in favour of the Claimant
      (the "Guaranty") as required by clause 14 of the Distribution Agreement with among
      others the following express terms:

          *"1.  Guaranty: Direct Obligations.  Subject to the terms and conditions set forth
          herein, [Claria] hereby irrevocably (during the period in which Guaranteed
          Obligations (as defined below) exist) guarantees to the [Sharman] (i) the full
          and prompt payment when due of all the payment obligations of [GAIN] under
          the [Distribution Agreement], whether for revenue share obligations, payments
          of advances or otherwise, and (ii) the full and prompt performance by [GAIN]
          of all its performance obligations in respect of the [Distribution Agreement]
          (clauses (i) and (ii), collectively, the "Guaranteed Obligations").  In the event
          of any default by [GAIN] in the payment or performance of any of the
          Guaranteed Obligations, [Claria] shall, on demand by Notice (as hereinafter
          defined), forthwith pay in full to [Sharman] and perform such Guaranteed
          Obligations...*

          *2.2 Protest [Claria] hereby waives any protest, diligence, demand or notice
          with respect to any breach by [GAIN] of its obligation under the [Distribution
          Agreement], except for demand by Notice for payment or performance of this
          Guaranty as provided in Section 1, and [Claria] hereby waives the filing of*

*any proof of claim or any diligence with respect to any proceeding of bankruptcy, insolvency, winding up, receivership, reorganization or analogous proceeding of [GAIN].*

*...*

*2.4 Collection.    ... In the event that [Sharman] does elect to undertake collection from [GAIN] or does elect to enforce the [Distribution Agreement], any deficiency or remaining amount due following such collection proceeding is guaranteed hereunder as a Guaranteed Obligation and shall be paid by [Claria] without limitation.*

*...*

*6. Cumulative Rights. ... Any determination by an arbitrator or court of competent jurisdiction on the amount of the Guaranteed Obligations shall be conclusive and binding on [Claria] irrespective of whether [Claria] was a party to the suit or action in which such determination was made; provided, however, that prior to seeking such determination, [Sharman] shall provide not less than ten (10) business days prior written notice to [Claria].*

*...*

*10. Governing Law and Jurisdiction. This Guaranty will be governed by and construed in accordance with the laws of the State of New York without regard to its conflict of laws principles. Any litigation or arbitration under this Guaranty will be in England and the Parties hereby consent to the exclusive personal jurisdiction and venue therein. The losing party in any proceeding related to or arising out of this Guaranty, including actions in tort, shall pay the costs and expenses (including reasonable attorneys' fees) of the prevailing party as determined by a court of competent jurisdiction ..."*

*The dispute and arbitration*

8.  Disputes arose between the parties by June 2005. In particular, Sharman claimed that GAIN had failed to allocate revenue in accordance with the revenue sharing provisions of the Distribution Agreement.

9.  On 29 July 2005, Sharman served notice on Claria pursuant to clause 6 of the Guaranty to the effect that GAIN had breached the Distribution Agreement; that Sharman would be claiming damages from GAIN in arbitration; and that any determination by the arbitral tribunal of the amounts payable in respect of Guaranteed Obligations under the Guaranty would be conclusive and binding on Claria.

10. On 12 August 2005, Sharman referred the dispute to arbitration in accordance with clause 13 of the Distribution Agreement. In September 2005, the International Center for Dispute Resolution of the American Arbitration Association ("**ICDR**") provided a list of potential arbitrators to the parties and invited each party to select an arbitrator.

, 33

Sharman nominated Mr. David Williams Q.C. as arbitrator. GAIN nominated Mr. Samuel Haubold as arbitrator. On 21 October 2005, the ICDR invited Mr. Alan Redfern to be the Chairman. His appointment was confirmed on 8 November 2005 and re-affirmed on 23 November 2005.

11. Accordingly, by 23 November 2005, Mr. David Williams Q.C., Mr. Samuel Haubold and Mr. Alan Redfern (together the "**Tribunal**") were duly and properly appointed as arbitrators in relation to Sharman's notice of arbitration dated 12 August 2005.

12. In its Statement of Claim dated 12 August 2005 served in the arbitration, Sharman claimed (among other things):

    (1) An account and inquiry into the sums due to it pursuant to the Distribution Agreement; and

    (2) Costs.

13. On 4 January 2007, the Tribunal issued a Partial Final Award in favour of Sharman. The Tribunal decided (among other things) that:

    (1) GAIN's revenue allocation methodology did not comply with the terms of the Distribution Agreement and accordingly GAIN was in breach of contract;

    (2) GAIN was obliged to pay Sharman any sums found due to it as a result of the Tribunal's rulings, and if no agreement was reached between the parties about the amounts due, the Tribunal would make directions for quantum to be decided;

    (3) The parties had agreed in clause 13 of the Distribution Agreement that the losing party should pay the costs of the prevailing party, including reasonable attorneys' fees, as determined by the Tribunal;

    (4) Sharman was the prevailing party and therefore GAIN should pay Sharman's costs of the arbitration, including reasonable attorneys' fees; and

    (5) The Tribunal would require further evidence to assess the costs GAIN was to pay to Sharman if the parties were unable to agree them.

*The Order for payment of Sharman's costs*

14. The parties were unable to reach agreement on costs and on 30 October 2007 Sharman applied to the Tribunal for it to assess its costs.

15. On 28 November 2007, the Tribunal assessed Sharman's costs and issued an Order for payment of such costs by GAIN forthwith. GAIN failed to pay.

16. On 6 December 2007, Sharman provided GAIN with remittance instructions for the payments ordered by the Tribunal. GAIN failed to pay the amount due, or any part thereof.



17.  On 13 December 2007, Sharman reminded GAIN of its obligation to satisfy the Tribunal's Order, but again GAIN failed to pay the amount due, or any part thereof.

*The Tribunal's Costs Award*

18.  Accordingly, on 21 December 2007, Sharman asked the Tribunal to make a partial final award in respect of its costs that GAIN had refused to pay.

19.  On 5 February 2008, the Tribunal issued its Interim Award on Costs (the "Costs Award") holding, declaring and awarding that GAIN should forthwith pay to Sharman the following sums, which had been assessed and determined by the Tribunal as being Sharman's entitlement to costs and expenses (including reasonable attorney fees) pursuant to its award of 4 January 2007:

    (a)  The sum of £1,269,682.24;

    (b)  The sum of AUD $12,445.60; and

    (c)  Simple interest on each of the above sums at the rate of 9% per annum from 28 November 2007 until payment.

20.  GAIN has failed to satisfy the Costs Award or any part thereof.

*Claria's obligations under the Guaranty*

21.  The amounts that the Tribunal ordered GAIN to pay to Sharman in the Costs Award constitute "Guaranteed Obligations" for the purposes of clause 1 of the Guaranty.

22.  Further, clause 6 of the Guaranty provides that the Costs Award is conclusive and binding upon Claria.

23.  By written notice to Claria dated 14 February 2008 Sharman demanded full and prompt payment by Claria of the Costs Award pursuant to clause 1 of the Guaranty. On 21 February 2008, Claria responded to Sharman's notice of demand and confirmed that it would not comply with the Tribunal's Costs Award.

24.  In breach of the Guaranty, Claria has failed to pay Sharman the sums the Tribunal ordered GAIN to pay Sharman pursuant to the Costs Award, or any part thereof.

25.  Accordingly, Sharman is entitled to claim and claims from Claria the sums of £1,269,682.24 and AUD $12,445.60 pursuant to clause 1 of the Guaranty alternatively as damages for breach of the Guaranty.

26.  Further, Sharman is entitled to claim and claims from Claria interest pursuant to the Costs Award at the simple rate of 9% per annum from 28 November 2007, amounting to £26,924.22 and AUD $263.91 at the date hereof, and continuing hereafter at daily rates of £313.07 and AUD $3.07 respectively.



27.    Further or alternatively, Sharman is entitled to and claims interest pursuant to section 35A of the Supreme Court Act 1981 at such rates, on such sums and for such periods as the Court deems fit.

AND the Claimant claims:

(1)    £1,269,682.24 and AUD $12,445.60;

(2)    Alternatively, damages;

(3)    Interest pursuant to the Costs Award and/or statute as aforesaid;

(4)    Costs.

JAMES LEABEATER

**Statement of truth**

The Claimant believes that the facts stated in these Particulars of Claim are true. I am duly authorised by the Claimant to sign this statement.

Full name: Nicholas Hugo Martin Fletcher
Name of the Claimant's Solicitor's Firm: Clifford Chance LLP

Position or office held: Partner

Dated this 22ⁿᵈ day of February 2008

Served by
**CLIFFORD CHANCE LLP**
10 Upper Bank Street
London E14 5JJ

Tel: 020 7006 1000
Fax: 020 7006 5555
DX: 149120 Canary Wharf 3

Ref: NHMF/70-40347848

Solicitors for the Claimant

THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
ROYAL COURTS OF JUSTICE

Claim No 2008 Folio

B E T W E E N

SHARMAN NETWORKS LIMITED

Claimant

- and -

CLARIA CORPORATION

Defendant

---

PARTICULARS OF CLAIM

---

CLIFFORD CHANCE LLP
10 Upper Bank Street
London E14 5JJ
Tel: 020 7006 1000
Fax: 020 7006 5555
DX: 149120 Canary Wharf 3
Ref: NHMF/70-40347848

UK/1566782/05

268803/70-40348748

**THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**ROYAL COURTS OF JUSTICE**

**Claim No.**              **2008**   **Folio**


Sharman Networks              **Claimant**
Limited

- and -

Claria Corporation            **Defendant**


---

# CLAIM FORM
# CPR Part 7

---


**CLIFFORD CHANCE LLP**
10 Upper Bank Street
London E14 5JJ
Tel: 020 7006 1000
Fax: 020 7006 5555
DX: 149120 Canary Wharf 3
Ref: NHMF/70-40348748


38



2008-Folio-214

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

**B E T W E E N:**

**SHARMAN NETWORK LIMITED**

**Claimant**

-and-

**CLARIA CORPORATION**

**Defendant**

**I CERTIFY** that the Judgment hereto annexed is a true copy of the Judgment filed in the Admiralty & Commercial Registry of the Supreme Court of England and Wales.

Dated the *10* day of July 2008

*A.G. Hodgson*

⎰⎱ Court Manager of the Admiralty & Commercial Registry of the Supreme Court of England and Wales

**THIS IS TO CERTIFY** that the above-named is the proper officer to certify that the Judgment hereto annexed is a true copy of the original Judgment on the file of the Admiralty & Commercial Registry of the Supreme Court of England and Wales.

Dated the *11* day of July 2008

The Admiralty Registrar of the Queen's Bench Division of the Supreme Court of England and Wales

EXHIBIT *3*

*39*

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
ROYAL COURTS OF JUSTICE

**Claim No. 2008-Folio-214**

Before THE HONOURABLE MR JUSTICE AIKENS

BETWEEN

### SHARMAN NETWORKS LIMITED

**Claimant**



- and -

### CLARIA CORPORATION

**Defendant**

---

### JUDGMENT

---

An Application was made on 19th June 2008 by Counsel for the Claimant under Part 24 of the Civil Procedure Rules, for judgment and was attended by Counsel for the Claimant and Counsel for the Defendant

**The Honourable Mr Justice Aikens** read the written evidence filed by the parties

**And** the Court having found that the Defendant has no real prospect of successfully defending this claim and that there is no other reason why this claim should be disposed of at a trial and the Court having dismissed the Defendant's application for permission to appeal this decision

**IT IS ADJUDGED** that the Defendant:

    1. do pay the Claimant the sums of:

        i. £1,333,548.52 (comprising £1,269,682.24 plus interest of £63,866.28 at 9% per annum from 28th November 2007); and

*40*

ii. AUS $13,071.88 (or the sterling equivalent at the date of payment)(comprising AUS $12,445.60 plus interest of AUS $626.28 at 9% per annum from 28th November 2007).

2. do pay the Claimant's costs of this action (including the Application for Summary Judgment) to be subject to detailed assessment if not agreed;

3. do pay the Claimant the sum of £150,000.00, within 28 days, on account of the costs awarded under paragraph 2. above.

**Dated the 19th day of June 2008**

41

## APOSTILLE
(Hague Convention of 5 October 1961 / Convention de La Haye du 5 octobre 1961)

### UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

1.  Country:  United Kingdom of Great Britain and Northern Ireland
    Pays:  Royaume-Uni de Grande-Bretagne et d'Irlande du Nord

    This public document / Le présent acte public

2.  Has been signed by
    a été signé par

3.  Acting in the capacity of
    agissant en qualité de

4.  Bears the seal/stamp of        The Supreme Court of Judicature, Admiralty and Commercial
    Registry
    est revêtu du sceau/timbre de

                                    Certified/Attesté
5.  at London/à Londres         6.  the/le    18 July 2008

7.  by Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs /
    par le Secrétaire d'Etat Principal de Sa Majesté aux Affaires Etrangères et du Commonwealth.

8.  Number/sous No        **H854858**

9.  Stamp:                               10. Signature:   **P Riley**
    timbre:





*For the Secretary of State / Pour le Secrétaire d'Etat*

**If this document is to be used in a country which is not party to the Hague Convention of 5 October
1961, it should be presented to the consular section of the mission representing that country. An
apostille or legalisation certificate only confirms that the signature, seal or stamp on the document is
genuine.  It does not mean that the contents of the document are correct or that the Foreign &
Commonwealth Office approves of the contents.**

42

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT
ROYAL COURTS OF JUSTICE
Claim No. 2008-Folio-214

**Before**
**THE HONOURABLE MR JUSTICE
AIKENS**

**BETWEEN**

**SHARMAN NETWORKS LIMITED**
**Claimant**

- and -

**CLARIA CORPORATION**
**Defendant**

-----------------

**JUDGMENT**

-----------------

**Clifford Chance LLP**
10 Upper Bank Street
London E14 5JJ

Ref: NHMF/70-20414154
Tel: 020 7006 1000
Fax: 020 7006 5555
DX: 149120 Canary Wharf 3

**Solicitors for the Claimant**

43